Good morning, and may it please the Court, Mark Fleming on behalf of Braintree Laboratories. It's stipulated that a patient following Breckenridge's label will drink a solution that is 473 milliliters in volume and that induces purgation, and then 10 to 12 hours later will do it again. That is two acts of infringement, and it should have compelled the judgment for Braintree. The district court's contrary ruling depended on two errors. First, it rewrote the claims to add an extra limitation nowhere in the claims. Second, it incorrectly held that a hatch-waxman defendant may escape liability if, in addition to inducing one act of infringement, it also induces a second act of infringement the next day. Both holdings were incorrect, and both are inconsistent with this Court's prior decision in the novel case, where Judge Dyke articulated both propositions in dissent and recognized that the majority rejected them. Are you saying that they're separate acts, or that together they're an act of infringement? Or does it make any difference in your argument? They are two acts of infringement. One, the evening before the colonoscopy, when the patient makes the infringing composition 473 milliliters, which induces purgation, and then 10 to 12 hours later, the morning of the procedure, the patient makes another 473 milliliter composition, consumes it, and that induces a second purgation. Those are two acts of infringement. Together they achieve the approved indication. In fact, they are the only way to achieve the approved indication while following the label. And that's why there's clear infringement under this Court's precedence. Now limiting ourselves, as we must, in light of the earlier decision that was made, I understand your arguments about the 100 to 500 milliliter point, and why you believe our earlier decision took that off the table. What I don't understand is your argument about Judge Dyke's sua sponte points about andas and unapproved uses. No party argued to us in any portion of any brief this unapproved use argument. In fact, no party even argued it to the lower court and then just didn't appeal it to us. This was sort of a product of a judge's imagination, and it appears in the dissent. We did not even speak to it in the majority. We never mentioned the words. Why would the majority be viewed as rejecting an argument never having been made in a case at any stage in the proceedings, on appeal, even at oral argument? Why would the majority sub silencio be viewed as rejecting such a different argument from anything that had been made before? I understand your 100 to 500 milliliter argument. I don't understand if you are claiming that the majority rejected the unapproved use notion, which is specific to Hatch-Waxman law and anda 271e claims, how the majority opinion can be viewed as having rejected that. If I may, Judge Moore, correct one premise of the question, which is that this argument was not made by Novel in the district court. It was, and Judge Sheridan in the District of New Jersey rejected it. Your Honor is right that Novel did not brief it and that Judge Dyke developed it in a generally consistent... And it was never argued to us. And it was never argued to us. Our basis for this proposition, Judge Moore, is in cases like Zenith and many other cases, Clemens from the Supreme Court and several cases from other circuits, where there was a dissent in a prior case, even though the parties had not argued the case. In Zenith, it had been raised only by an amicus, and in other cases, it hadn't been raised by anybody. But the subsequent panel said the prior court implicitly rejected the argument raised by the dissent. We quote a number of these in our blueprint. Well, that argument may well have been much more intertwined with the arguments that were made than this one. This unapproved uses argument seems completely divergent from the arguments related to purgation, the one bottle theory, the number of ounces that are present. Those arguments are all very much intertwined, and so I understand exactly how you are relying on them. In these other cases, I believe that the arguments were likewise in Zenith, for example, intertwined in a way that it was reasonable to assume the majority had implicitly sub salentia, rejected it. But I'll be honest with you, the unapproved uses idea, I was like, huh, I don't know what to make about that. And boy, I'm not going to touch it in the majority because it wasn't briefed by anybody. So there you go. There you have an insight into exactly what the heck went through my mind when I saw his dissent. Your Honor, I'm not going to try to convince you of what you meant in a prior decision. And we do not need to do that in order to prevail on this issue, because even if the novel opinion had never happened, the district judge in this case was still wrong to reach the conclusion that the court did. And I'm happy to turn to the Hatch-Waxman argument, if Your Honor wishes. I'm also happy to talk about the volume limitation. Well, when I read it, I thought it was clear what was meant. Well. Just kidding. Just kidding. Don't go back. We think that that is an easy way to reverse the district court in this case. But even if that opinion had never been issued, the district judge was wrong to do what happened. Can I summarize your unapproved uses in a slightly different way than you said it and see if it's nonetheless something that you think is an accurate reflection of what you were arguing? I kind of understood you to say, although maybe not exactly quite this clearly, that this isn't an unapproved use. It's exactly the same use. They're colon cleansing via purgation. We're purgation. How can you say it's an unapproved use? It's exactly the use. This is different from cases where it's discovered that, I don't know, we have one past one where birth control pills can help premenopausal women with hormone imbalances. That's a totally different use. It bears no resemblance to the use for birth control. But this is a case where the use is, this is from a factual matter. I can agree with every statement of law in Judge Dyke's opinion, if I want to, dissent, but nonetheless from a factual matter conclude that they don't apply here. Is that one of the arguments you make? It is the argument we make, Judge Moore, and if it's not clearly stated in the briefs, let me adopt it now. That's absolutely right. No, I think it's the argument you make. It sure is the argument. Right. I thought it was. And it's the point is this, that the FDA has approved directing a patient to perform the patented method. It's just done it in a context where it happens twice, once on the first day and once on the second day. In its reply brief below, this is on 2201 of the appendix, Breckenridge admits, quote, purgation is the mechanism by which the approved indication of colon cleansing is achieved, close quote. Very different from the cases that Breckenridge relies on where a patient following the label wouldn't have performed the claim method at all. This case is very exquisite. I thought when I read it that this case could be quite narrow, because I like to be narrow and not overreach, especially if I don't necessarily know if I understand all the boundaries. But they stipulated to these things. So this is not a case where I have to conclude and make any fact findings about whether purgation is the method or whether purgation occurs after 473, because those are all factual stipulations. Page 1780 of the appendix, paragraph 25, drinking one six ounce bottle of Cyprus's, which is Breckenridge's predecessor, proposed generic version of Suprep diluted with water to 16 ounces will induce purgation from the colon of a patient under the construction of the term purgation adopted by the district court in the novel case. And the rest of the stipulation makes clear that what happens the next day is exactly the same thing. The only way that this court could affirm the judgment in this case would be to create a special new Hatch-Waxman specific rule, which is basically what Breckenridge is asking for and what the district judge did, which is to say that if you add a second instance of the infringement, other unclaimed matter, that somehow gets you out of infringement in a Hatch-Waxman context, when it clearly wouldn't in the traditional infringement analysis, where this court has been very clear that the adding of unclaimed matter doesn't excuse or absolve infringement. A fortiori, where the unclaimed matter is a separate instance of performing the claimed method. I mean, we think simply that what regrettably happened in the district court, who didn't hold any oral argument or markman proceeding in this case, simply misunderstood the role of the label in a Hatch-Waxman case. This court has always used the label as a way to figure out what's going to be induced when the generic product is marketed. But there has never been a case that I know of, and Breckenridge certainly doesn't cite one, that says that a patent can only be infringed if it covers every single thing in the label. All that matters, and this is this court's decision in AstraZeneca, is whether the method induces performance of the claimed method. And here it clearly does that by stipulation. If the court has no further questions on that, I'm happy to address any questions the court has on the volume limitation. I mean, we think that's quite easily resolved based on the plain language of the claims. The claims start, if we look at Claim 15, with a composition for inducing purgation, and then it says the composition, having a volume of 100 to 500 milliliters. They clearly refer to the same composition. There is no reason in grammar or common sense to think that the composition that has a volume between 100 to 500 is anything other than the composition that induces purgation. So we would submit that on both those rulings, the judgment should be reversed, and the case remanded for direction of entry of judgment for Braintree, I'd respectfully reserve the balance of the case. Wait. Entry of judgment for Braintree. Did you have a cross motion that is now, that is on appeal? I mean, this is summary judgment. It is, Your Honor. Usually summary judgment results in vacating and remanding. That's true, and we wouldn't have a problem with that, but because of the procedural nature of this case, Breckenridge has stipulated that this is the only non-infringement argument they have. That's on page 296 of the appendix, paragraph 3. It's one thing to stipulate this is their only non-infringement argument, so they stipulate to infringement. They do. They say, page 296 of the appendix, paragraph 3, the second sentence, if the court denies Cyprus's motion, Cyprus stipulates that its proposed generic version of Braintree's suprep described in the ANDA infringes claims 15, 18, 19, 20, 21. I understand. So there's nothing left to try. All that's left is judgment of infringement. Okay, well, they'd really have to so stipulate in a Hatch-Watson act, would they not, in any case? I think that's right, Your Honor, given that this is the only defense that they preserved. Everything else they agreed to be bound by the novel judgment, which is now conclusive and non-appealed. Okay, let's hear from the other side. Thank you, Your Honor. You're right, they wouldn't satisfy Hatch-Watson, otherwise. No? Mr. Lieberman? Good afternoon, Your Honors. Judge Newman, my appellate court. Good afternoon. I'd like to address first the issue of waiver and preclusion and whether this court's prior ruling precludes my client from advancing the arguments that it's advancing. I think there's no question, as Judge Moore's question to Mr. Sheridan pointed out, and there's an admission from Braintree on this point in their blue brief at page 29, note 3, that novel had not raised in the prior proceeding, I call it the unapproved dosage issue that the FDA Hatch-Watson issue. So I think there's no question that the prior court's decision didn't address that. As to the issue of the volume limitation, there are two places in the record where I was close to admitting that that argument was not made at all. The first one is at page A1029 of the record, which was a joint letter to the district court judge in connection with the request for permission to file the summary judgment motion. And here's what they said. Novel did not appeal the district court's rejection of that non-infringement argument, and what they were referring to was the volume limitation, and instead appealed the court's infringement finding on other grounds. They also said something very similar, although a little more nuanced. Yeah, but who cares what they said, right? I mean, they can say something wasn't waived, or was waived, or wasn't decided, and it was decided. Doesn't it only matter whether we conclude the court decided it? Yes. Yes, OK. But they have admitted that the issue, at page 1303 of the brief, they admit that this issue was not raised as a separate argument. Yes. That's not the same as saying we didn't issue an opinion that resolves this issue. Well, I would submit that you can look through that opinion, and you will see no discussion except in Judge Dyke's dissent of the volume limitation argument. That's not true. We say at one point, 473 milliliters, i.e. the one-bottle theory, falls within the claimed volume. In the context of the purgation argument that is being made. Our argument is completely different. Which is the only thing that the claim covers. The claim says a composition for inducing purgation from about 100 to 500 milliliters. I'll tell you, all of your arguments about what the specification in the example says, and how they're talking about total volume, and if there are multiple doses, they all add up together. I agree with everything you say. The difference is, A, most of those examples go to cleansing. And we've already determined, and this we are bound by, the purgation is not cleansing. It's something less than cleansing. It's the beginning of the process of cleansing the colon. But you don't have to achieve cleansing. And so here, what this claim covers, which differs from those examples, is it focuses on the amount of liquid you must consume to induce purgation, not to induce colon cleansing. With all due respect, Judge Moore, I believe that's not correct. How? Look at the claim. Look at the claim. I'm looking at the claim language, and I see independent claim limitations, each of which must be met. A composition for inducing purgation, and we've all decided the inducing purgation is a claim. We are not challenging that point. And we have never challenged that point. There is a separate independent limitation, which is a composition comprising from about 100 to about 500 milliliters. How is that separate? We've decided that inducing purgation is a claim limitation. But what has to be administered is from 100 to 500. Now, how do you determine whether one partial dose... You've admitted that you administer between 100 and 500, and then that amount induces purgation. We've admitted that that is a partial administration... For colon cleansing. No, you've admitted that's a partial administration for colon cleansing. What you also stipulated to is that that amount by itself induces purgation. No. You didn't stipulate to that? Because I'll find the page. Yeah, yeah, that statement we stipulated to, we have never made the purgation argument that was made by novel. Our argument is very simple. It's very clean and elegant, and it's completely different. It's there is an independent limitation of 100 to 500 milliliters. How do you determine whether that limitation applies to a partial dose or to the full dose? The only dose approved by the FDA, and here's how. In the specification, in four different places, talking about the small volume prior art, which was administered in multiple doses, the large volume prior art, which was administered in multiple doses, the experimental solution, which was the only example that they gave, and the FOSS Fleet Soda, which they compared against the experimental solution. In each and every instance, they are referring to the total volume of product administered, which tells you something about... It doesn't necessarily dispose of the issue, but I believe the prosecution history does. It tells you something about what that 100 to 500 means. Now you look at the prosecution history. When the Braintree folks were trying to distinguish over the Nisho and the Giuliani reference, how did they do it? They said, unlike Giuliani, which provides for, which has four liters or two liters, I don't remember which was which, a volume, we have 100 to 500. And they did the same thing for Nisho as well. So they're saying, when you're looking to see what 100 to 500 is, you look to the total volume of what's administered twice. That, I'll get to that issue right now, but the... Actually, no, it's not... Yes, there are two partial administrations, but under the claim construction that the district court adopted... 50 to 250? 100 to 500, Your Honor. Under the proper claim construction, the 100 to 500 refers only to the total dosage that's administered. And I can explain why in this case... Let me ask you something. In all of those prior art references, and when they talk about the total dose for colon cleansing, why is that relevant to what the total dose is necessary to induce purgation? Because that's what, excuse me for one second, that's what this claim covers. The dose necessary to induce purgation. So why are prior art discussions of total volume necessary to achieve colon cleansing necessarily a disclaimer about what volume is necessary to induce purgation? I believe the predicate to your question is incorrect, and I would direct you to page A1399 in the appendix. That's the Nisho site, and I'll give you a site for Giuliani in a second. Here is the statement that Braintree made. Understand that the claims at that time had the word purgation in them. This was during the re-exam. Claims had the language purgation. This is how they distinguished Nisho. Nor does Nisho disclose the use of about 100 to 500 milliliters. Rather, Nisho discloses the use of two liters. They don't say it's different because of purgation versus cleansing. The claim language is purgation. They say Nisho is different because of the difference in the volume. Similarly, at A1426, with respect to Giuliani, they said during the re-exam, with regard to the volume, Giuliani discloses four liters, not about 100 milliliters to about 500 milliliters. So when the claim term had the limitation purgation in it, this is how they distinguished it. Now, Your Honor, Judge Moore wrote a decision a couple of years ago in a case called U-SHIP. This was an argument made for the first time in the reply brief that Braintree had submitted. They said, well, we understand that there were certain statements made during the prosecution, but those statements weren't necessary for us to get over the references. They weren't necessary because the prior art solutions were isotonic solutions, and we are claiming hypertonic solutions. But in the U-SHIP case, and a whole line of cases that you cited, Judge Moore, it's very clear that if you make a disclaimer during the prosecution history, even if you were not required to do it, even if it wasn't necessary because it was another way to distinguish your invention, you are bound by it. So our view is, number one, plain language, claim construction using the claim in the prosecution history. Number two, if you don't agree with that, there is an express disclaimer at the two pages I cited and the other coordinate sites regarding Nisho and Giuliani. I guess I don't see it as an express disclaimer because what I don't see is them saying that NISO discloses two leaders for purgation. What I see is the only use of the word purgation in here, I mean, they talk about a lavage solution. They talk about preparing for colon cleansing. The only use of purgation is nothing in NISO specifically teaches this combination of particular salts for purgation. That's the only time they mentioned the words purgation. So I don't know how, with clarity, how their statement relates to purgation versus cleansing, which has now, in the infinite wisdom of this court, been declared to be something different. I don't know if that decision is right in hindsight. I'll be honest with you. I kind of looked at it and thought, hmm, I don't remember that case as well as I now see it. But I'm bound by it. That much is 100% clear. Judge Moore, I think that you don't have to see those words in their statement in the prosecution history because the only word in the claim was purgation at that time. There was no cleansing in the claims. It was purgation. They were distinguishing the prior art over the claim, which had the purgation language. Yes, but I don't know what the prior art uses two liters for. Does it use two liters for colon cleansing? Does it use two liters for purgation? If what they're saying here is the prior art requires two liters to achieve purgation, our claim only requires 100 to 500 milliliters to achieve purgation, then that doesn't have at all the disclaimer that you want it to have. And I don't know the answer to those questions. So let me tie this back into the specification. Somebody looks at 100 to 500 and says, OK, I know what about 100 to about 500 means. To what do I apply that? That's the question. And Mr. Sheridan says you apply it to each partial dose so we infringe twice. And I say, no, what that applies to is the total volume that has been administered. This is what Judge Dyke said. This is what the district court judge said. Why? If you look at the specification, whenever there is a discussion of either the prior art or the experimental solution, which was the only example given, or what the experimental solution is compared to, it talks about the total solution that is administered. I agree, but in the specification, it has all these columns. And by the way, it looks like a somewhat disgusting experiment. I do not wish to be a part of it. I would agree with that. It involves drinking copious amounts of liquid. And then here's my favorite part. They measure the input, and guess what? They measure the output. So you've got input measurements and output measurements. So along, you're consuming various amounts of liquid en route to what I hope and imagine is a completely clean colon. But the whole point, and so it makes sense that they're talking about the total amounts of volume in the course of that experiment. But that's different from saying the total amount for purgation. I mean, that's the difference. The claim here is narrower than what those experiments sought to measure. Let me just add, for those of you with children, sounds like a science fair project. Oh, no, it does not. Let me see if I can reorient. You stay away from my children. Let me see if I can reorient the fundamental axis of this case. We normally, in Hatch-Waxman cases, you presume that the patent is going to cover the brand company's product. You start with that assumption. And if it doesn't, you wonder why. What's the argument? There's got to be some problem with that. But here, if we look at page 1882 of the appendix, we have the answer. And the answer is in a declaration from Cleveland, the sole inventor. What he says is, due to these two concerns, this is in paragraph 11 on page 1882, and the two concerns were the palatability of the solution and the salt staying in solution. Could they get it to stay in solution? That arose during early drug development. We increased the volume of the solution relative to the experimental solutions. So during the process of getting approval, they increased the volume. Now, what they did, this patent was directed to their product, I assume, as it existed at the time that they prosecuted the patent. They got the original patent in 2005. They got the re-exam certificate issued in 2009. Their NDA didn't get approved until 2010. And what we learned from Cleveland in 1882 is what happened is they increased the volume of their product because it couldn't keep stuff in solution, and it was unpalatable. Is your product still pending approval? We have tentative approval, Your Honor. Final approval is on hold only because the FDA has not yet finally determined that there's been a waiver of the first filer exclusivity, that Lupin, which purchased novel, has. So that's the only issue holding us from final approval. So how do we know? How can we confirm from the prosecution history that this is, in fact, what was going on? When they filed for a patent term extension, when they filed for a patent term extension, it was a mess. They made mistakes twice. But in both cases, the first time they filed for a patent term extension, and this is back when, before the re-exam certificate issued, the language 100 to 500 milliliters wasn't there. It said small volume. They said, we come within the scope of the claims because small volume encompasses 946 milliliters. But the purgation language was still in there. So they're saying, our product is 946 milliliters, and it still comes within the scope of the claims. That's what they argued for patent term extension. So we have Nisho, Giuliani, patent term extension. Every time the volume is referred to with respect to the prior art, the experimental solution, it all refers to the term. That was all before we decided what purgation meant. But our argument has nothing to do with purgation. That's where we disagree. Well, I hope that Your Honor will not actually disagree on that point because I would suggest the claim language, which has a comma in it, is saying claim element one, claim element two. Claim element one is purgation. Claim element two is whatever is accused has to be 100 to 500. So let me transition very quickly, if I may, to the FDA issue and tie it into this. The FDA has approved only one product. The one product is a 946 milliliter product. It happens to be administered twice, but it is a 946 milliliter product. We can't sell it for 73. We can't tell a patient to take only one bottle. There is no evidence in the record, and there was no argument that was ever made by Braintree, that any patient has ever taken just one bottle, or that we've ever encouraged a patient to take one bottle, or that any patient would take one bottle. The instructions are clear. The approved use is clear. It is only a product that is 946 milliliters. If you agree with me that there is an independent limitation of 100 to 500, then because the only product that's approved is 946, we should prevail. But you've agreed to infringement. Is that right? Otherwise, there'd be no Hatch Watchman action at all. No, we've disputed infringement. We filed a paragraph for certification, Your Honor, disputing that we infringe. This is the only non-infringement argument that we have made, because pursuant to rule one of the federal rules of civil procedure, we opted for a speedy, what we hoped would be a speedy, inexpensive determination of this matter by taking what we believe to be a silver bullet, absolutely correct, claim construction position. On the theory that it was administered, that the 900-some-odd milliliters was not No, no, no. It's administered, well, I don't know that we need to focus on what the word dose means, but there was only one product. No, I'm really trying to understand where in the Hatch Watchman proceeded the, so it was only, it was under paragraph four, solely for non-infringement, not for invalidity? That's correct. I don't remember if we certified on invalidity, but we agreed before the district court to be bound by the validity determination in the prior novel case. So we are not asserting an invalidity argument, and we are precluded from asserting an invalidity argument. But if what was approved was a 900-some milliliters, so that, but I had the impression from the record that your client also was providing the two separate 500-milliliter doses. Of course, we are required to do that, Your Honor. We have to sell two bottles, and we have to provide the same instructions that are in the NDA, which is take one of them the night before, and take one of them the morning of the procedure. Yes, that's what I thought was the case, in which case, why the emphasis on the 900 milliliters? Ah, because under the Bayer versus Alon decision, which this court decided in 2000 that had to do with, it was a composition claim, and the claim was to micronized nifedipine having a specific surface area of not greater than four square meters per gram, a less disgusting case than the subject matter here. The accused product was defined by an ANDA that said that the micronized nifedipine would have a specific surface area of 4.7 square meters per gram. The court said the product is defined by the specifications in the ANDA. The specifications in the ANDA said 4.7, therefore, there couldn't be infringement. Our product here, we only sell one product. It's 946 milliliters. We believe that it is irrelevant that it is taken in two separate partial doses, because properly construed, the 100 to 500 milliliter limitation. But I thought you said that it's required that the two doses, two partial doses are required. That's absolutely correct, and we can, but a patient, we are not allowed to market our product or to otherwise do anything to induce a patient to take only one product. How about if they take two at once? Well, that would be contrary to the label. The label says you must, you're required to, well, I guess the patient isn't required. The label says take one the night before, take one the next morning. But we can only market it that way. But again, the total volume is 946. We sell only one product. We can't sell one bottle. The FDA would never approve one bottle because you have to copy the label of the brand name company. So we're selling one product. The product is 946. If you decide that that limitation is an independent limitation, and you agree that the independent limitation covers the total volume that's administered, then we would succeed, I would submit, on both the claim construction argument and on the FDA argument under the Bayer v. Warren case. Okay, any more questions? Any more questions? Thank you very much. Thank you, Mr. Lieberman. Mr. Fleming. Thank you, Your Honor. If the court thinks it's unpleasant to read about the experiments, one thing that would have been more unpleasant was taking the prior art isotonic solutions, which required a patient to consume up to a gallon of fluid over the course of one to three hours. And what would have been even more unpleasant than that is going for the colonoscopy and having the doctor say, you know what, you must not have had the full gallon because I can't see well enough to do this procedure. Go back and do it again. That's really what the invention was here. Instead of the prior art isotonic solutions, Suprep was specifically designed as a kit with two separate bottles. Each bottle carefully engineered to have just the right balance of salts, just the right volume of liquid so that when diluted, it creates a hypertonic solution of just the right concentration so that a patient can safely experience a purgation. Then go to bed and 10 to 12 hours later, do it again, have another purgation, and then the colon is clear and can be visualized. The patent reads on each bottle's separate composition and each bottle's separate administration as directed by the label. I would point out on the volume limitation what the court didn't hear from Mr. Lieberman. The court did not hear any effort to situate his additional limitation of the entire treatment period in the plain language of the claims. He can't do it. The district court couldn't do it. It's impossible. The only way to do it renders the claim incoherent because it means that the first mention of the composition, a composition for inducing purgation is directed to the amount that induces purgation, 473 milliliters, whereas the second time when it says the composition that has the volume between 100 to 500 clearly refers back to the antecedent A composition. For some reason, that then is gonna be referring to the total amount needed to induce cleansing. It makes no sense. That's why Mr. Lieberman runs directly to the way that he reads the specification and the prosecution history, but nothing he said pointed to an express disavowal that meets this court's standards for lexicography or disavowal, which the court has repeatedly said are exacting. With respect to the Hatch-Waxman point, the infringement test in a Hatch-Waxman case is whether the label induces a user to perform every step of a patent claim. The district court and Mr. Lieberman get that analysis exactly backwards. They're asking you to look for whether there's a patent claim that covers every step of the label. That has never been required. As long as the label induces performance of the claim method, there is infringement. The fact that there may be something else besides does not matter a fortiori when the something else besides is performing the claim method a second time. If the court has no further questions, we respectfully submit the judgment should be reversed. Questions? Okay, thank you. Thank you both. The case is taken under submission. That concludes this morning's arguments. All rise. The honorable court is adjourned until tomorrow morning. It's an o'clock a.m.